OTIS ELEVATOR COMPANY, Appellant,

v.

Mrs. Emma L. JACKSON and Willie C. Jackson, Appellees.

No. 20426.

United States Court of Appeals Fifth Circuit.

Dec. 12, 1963.

an elevator being operated by her descended at an inordinate rate of speed, and stopped only after reaching the lower limit, that is to say the pit, of the elevator shaft. Her husband, the other appellee here, also sued to recover medical expenses, and damages for loss of services and consortium.

The suits were consolidated for jury trial, and judgments were entered on jury verdicts for appellees in each of the suits. This appeal is from those judgments. The sole assignment of error is based on the contention that the evidence was insufficient as a matter of law to support the verdicts, and the court therefore erred in failing to grant the motions of Otis for directed verdicts, and for judgments notwithstanding the verdicts.

The two passenger elevators in the hotel were installed about the year 1910. They were of the drum type, and were manufactured by Otis, but the fact of manufacture is not here involved, nor is there any question raised concerning the obligation of Otis under the circumstances to an employee of the hotel. This case has to do only with, and turns on, the following relevant facts considered in light of the error assigned.

Otis entered into a contract with the Hotel Company under date of September 12, 1957 whereunder it, for a monthly consideration, was to service the passenger elevators situated in the hotel. The pertinent parts of the contract are printed in the margin,[1] but generally the

Benjamin L. Weinberg, Jr., Thomas J. Long Atlanta, Ga., for appellant.

R. Beverly Irwin, Atlanta, Ga., for appellee.

Before TUTTLE, Chief Judge, and JONES and BELL, Circuit Judges.

BELL, Circuit Judge:

Emma L. Jackson was employed by the Georgian Terrace Hotel in Atlanta as an elevator operator. She sued appellant Otis Elevator Company to recover damages for personal injuries sustained when

1. "We propose to furnish OTIS SERVICE on Two (2) Car Switch Passenger elevator located at 659 Peachtree Street, N. E., Altanta, Georgia from October 1, 1957 and continuing thereafter until this agreement is terminated by 30 days' notice to that effect given in writing by either of us, for the sum of One Hundred and Seven and 75/100 ($107.75) dollars per month, payable monthly.

* * * * *

"This service is to consist of a weekly examination of the elevators, including oiling and cleaning machine, motor and controller; greasing or oiling bearings and guides; making necessary minor adjustments. Emergency minor adjustment

call-back service will also be provided between regular examinations should trouble develop with the equipment and you notify us of such trouble.

"We will also examine, lubricate and adjust the following accessory equipment: "2. Motor Generators Sets, Door Closers, 2-Car collapsing Gates, Door Hangers, 2 Light Annumciators, 2 Fans, and Car Lights.

* * * * *

"In addition we will furnish the following supplies as and when necessary: Carbon and copper contacts, contact insulations, contact springs, cable connectors, contact holders, distance pieces for any of the switches of the controller,

service was to consist of a weekly examination of the elevators including oiling and cleaning machine, motor and controller, greasing or oiling bearings and guides, and making necessary minor adjustments. Emergency minor adjustment call-back service was also provided between regular examinations in the event of trouble. In addition, Otis agreed to furnish certain parts and supplies as and when necessary.

This contract was in effect on October 16, 1959, on which day Emma L. Jackson, while operating the elevator known as Number One answered a call from the eighth floor of the hotel. She operated the elevator in such a manner as to take it to the eighth floor where eight men, guests of the hotel, entered the elevator. It had a capacity of twenty five hundred pounds. After closing the elevator door, she started the elevator in such manner as to descend to the main floor of the hotel.

In her words:

"* * * Immediately after leaving the eighth floor, I could hear a popping, like something overhead, like electricity or something. I don't know what it was. Anyway, we get to the—about the sixth floor, I could tell the numbers was passing fast, I begin to put it on reverse to make it stop. It wouldn't stop. About the fourth floor, I pressed the emergency. It still did not stop. I told the peoples on there, I said, 'We are falling. Lord have mercy.' And before I could get anything else out, we was down, and struck. * * *"

One of the passengers testified with respect to the occurrence:

"* * * We started down, * * and the first—I was first alerted by a sort of popping or cracking or something of the kind, and glanced at the operator and she did something with the control there that was on it. I don't know what she did; but she moved that to some place, a control, and then I don't— she was making other moves, and she said that we were falling. She said the elevator was falling. We couldn't stop at that floor. We didn't stop where we were supposed to stop.

\* \* \* \* \* \*

"Well we hit in the basement. We hit the—the—in the basement and when we hit there, of course, there was a lot of confusion; and debris fell, although I looked at the elevator and it looked—glanced getting out, and couldn't see where it fell from. But debris did fall, and hit me on the head and shoulders, and I was standing close to the operator. * * *"

Another passenger, a retired Army General, gave this view of the incident:

"Well, the elevator operator started to go down, move the lever to go down, and it seemed to jerk, and seemed to jerk and start slipping, and she was trying to stop it, and it accelerated as it went on down, and I heard her say, 'We're falling.' And apparently she couldn't stop it, and it accelerated, at an accelerated rate of speed, until it got to the bottom. I know it went into the pit and crumpled me up on the floor."

The speed of the elevator was controlled by regulating the field of the drive motor. This was done by the elevator operator using or moving the control handle in the elevator cage. The braking system consisted of brake shoes on the cable drum which were electrically ener-

brake, governor, interlocks, and for the stopping and car switches; brushes for the elevator motor and generator; oils, greases, rope preservatives and cleaning materials.

\* \* \* \* \*

"Overtime callback service is included as a part of this contract.

\* \* \* \* \*

"It is agreed that we do not assume possession or management of any part of the equipment but such remains yours exclusively as the owner (or lessee) thereof."

gized, and mechanically applied when the control was in neutral position. In the event of a power failure these brakes were automatically applied. The elevator was also equipped with a safety system actuated by a governor which was set at a certain speed or rate of drop. When this speed was exceeded, the safety system was to actuate by jamming two wedges between the car and the guide rails to bring the car to a sudden stop. This latter system was not actuated and there is no evidence that the speed reached the necessary point. There is no issue presented as to negligence for failure to set the governor to actuate the system at a lower speed, or that it failed to function properly. Cf. Blackhawk Hotels Company v. Bonfoey, 8 Cir., 1955, 227 F.2d 232, 56 A.L.R.2d 1047. Whatever happened was at a lesser speed.

■ Thus eliminating this safety system, we are left with the question of whether Otis failed to exercise ordinary care and diligence in the performance of its contract under the other facts obtaining, and if so, in what respect. The record contains documentary evidence from the files of Otis that on a previous occasion, November 19, 1958, Otis was called to service this elevator. The remarks of the serviceman were: "Car would stick with load every time it went to basement. Going on final limit. Reset automatics at top and bottom where car would stop properly at terminal landings." This was not further explained. A former manager of the hotel testified that the same elevator had gone into the pit on other occasions, not specified, and this statement was not further developed.

The regular inspection or examination of the elevator was made by Otis on October 14, 1959, two days prior to the date of the occurrence in suit. The serviceman who made that inspection testified that he inspected the elevator from "top to bottom" and found nothing wrong then. He was called, along with a City of Atlanta elevator inspector, to the scene of the fall on October 16th. His report shows: "Elevator on bottom limit. Reason unknown. Correction: picked up car. Checked and found no other trouble." His testimony was that he inspected the elevator at that time and found nothing wrong. He could not explain the cause of the fall. He was backed up in this by the city inspector. They did not test it with the same load, satisfying themselves with a load of three men. In short, according to Otis, there was nothing wrong with the elevator two days before, and nothing wrong after it fell.

An expert witness for appellees testified in substance that it was his opinion, based on the past service records pertaining to this elevator, the testimony of a popping noise, and a jerking sensation together with the fact and manner of the fall or descent, that the field was held out due to arcing contacts thus allowing the drive motor to start and run at full speed with the result that the descent was at full motor speed. Putting the handle in the neutral position was ineffective for the same reason. The application of the emergency button placed the brake in mechanical operation but the brake, being adjusted for a soft stop, failed to hold in view of the weight and speed.

■ We lay aside the doctrine of *res ipsa loquitur* as not being applicable against Otis for it was not in exclusive custody or control. Baldwin v. Georgia Automatic Gas Co., 1952, 85 Ga.App. 767, 70 S.E.2d 108, and Otis Elevator Co. v. Robinson, 5 Cir., 1961, 287 F.2d 62, but, this aside, there was nevertheless a sufficient factual basis to support an inference of negligence on the part of Otis adequate to take the cases to the jury.

Otis was under the contractual duty to make a weekly examination of the elevator, and we treat this from the tenor of the contract and from the testimony as to the practice followed of inspecting as an agreement to inspect. See Wrobleswski v. Otis Elevator Company, 1959, 9 A.D.2d 294, 193 N.Y.S.2d 855, involving the same type contract, for a similar holding. Having undertaken to inspect,

it must have been done in a reasonably careful manner.

We think the jury could fairly draw the inference that the elevator was out of order and that the trouble was not detected because of a faulty inspection. The inference would have support in the fact of the prior inspections, including the one performed two days earlier, with no finding of deficiency, and the inspection immediately after the fall with no finding of a deficiency; coupled with the fact of the fall, the popping noise and jerking sensation, and the abnormal rate of descent in spite of all proper and available steps to stop having been taken by the operator. Our view is buttressed, precedentwise, by Otis Elevator Company v. Robinson, supra; Wroblewski v. Otis Elevator Company, supra; and compare Callaway v. Hall, 1938, 58 Ga.App. 795, 199 S.E. 899. There was no contention of, or evidence to support, a theory of operator error. The sole posture of the case was that of a casualty resulting from the failure of an elevator system to function normally.

It follows that the judgments should be and are affirmed.